IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

_____

|  |  |  |
|---|---|---|
| SPECTRALYTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CORDIS CORPORATION and | ) | Civil Action No. 05-1464 (PJS/RLE) |
| NORMAN NOBLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRE-JUDGMENT AND POST-JUDGMENT INTEREST, AN ACCOUNTING, A PERMANENT INJUNCTION, ENHANCED DAMAGES, COSTS AND ATTORNEY FEES

## Table of Contents

**Page**

INTRODUCTION ..................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.     INTEREST, COSTS, ACCOUNTING AND INJUNCTION ........................................... 2

II.    ENHANCED DAMAGES AND ATTORNEY FEES ..................................................... 3

     A.    A Finding of Willfulness Does Not Mandate Either Enhanced
          Damages or Attorney Fees ...................................................................... 3

     B.    Defendants Mounted a Good Faith Defense and Should Not be
          Punished for Challenging the '277 Patent ................................................ 6

     C.    The Evidence of Willful Infringement Was Exceedingly Weak .................. 9

     D.    The *Read* Factors Confirm That There Is No Basis to Enhance
          Damages or Award Attorney Fees ........................................................... 14

          1.    *Read* Factor #1: No Deliberate Copying of the '277 Tooling .................. 15

          2.    *Read* Factor #2: Investigation and Good Faith Belief of Invalidity
              or Non-Infringement ................................................................... 17

          3.    *Read* Factor #3: Defendant's Behavior As a Party to the Litigation ......... 19

          4.    *Read* Factor #4: Defendant's Size and Financial Condition .................... 19

          5.    *Read* Factor #5: Enhanced Damages and Attorney Fees Are
              Improper in "Close" Cases .......................................................... 20

          6.    *Read* Factor #6: Duration of Defendant's Misconduct ........................... 21

          7.    *Read* Factor #7: Remedial Action by the Defendant .............................. 22

          8.    *Read* Factor #8: Defendant's Motivation for Harm ............................... 23

          9.    *Read* Factor #9: Whether Defendant Attempted to Conceal
              Its Misconduct .......................................................................... 24

     E.    Defendants' Litigation Conduct Does Not Warrant an Award of Fees ....... 24

          1.    Defendants Fought a Hard Case and Took Positions That Were
              Supported by the Facts and the Law ............................................. 25

              i.    Defendants' Infringement Arguments Were Not Contrary
                   to the Court's Claim Construction ................................... 26

               ii.    Defendants Did Not Engage in Discovery Misconduct ................. 27

               iii.    Defendants Did Not Improperly Vouch for the Merits
                   of Their Case ................................................................. 29

Table of Contents
(continued)

|   |   | | |
|---|---|---|---|
| | iv. | Defendants Went Beyond the Burden Imposed on Them Under Fed. R. Civ. P. 30(b)(6) | 33 |
| 2. | | Spectralytics Committed Litigation Misconduct and Therefore Cannot Be Awarded Fees | 36 |
| | i. | Spectralytics Defeated Summary Judgment with False Allegations | 36 |
| | ii. | Spectralytics Elicited False Testimony About D-83 | 37 |
| | iii. | Spectralytics Elicited False Testimony About Madsen's Review of the Process Parameter Checklists | 39 |
| | iv. | Spectralytics Attempted to Use the Court's Order As Both a Sword and a Shield | 40 |
| | v. | Unfounded Accusation of Document Destruction | 41 |
| | vi. | Unfounded Accusation of Unfair Surprise | 42 |
| | vii. | Baseless Accusation Against the Court | 42 |
| CONCLUSION | | | 44 |

3193854v.4

**Table Of Authorities**

**Page(s)**

**CASES**

*Acumed LLC v. Stryker Corp.*,
    No. 04-CV-0513-BR, 2006 WL 3409074 (D. Or. Apr. 17, 2006) .................. 23

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*,
    No. C-95-03577 (DLJ), 2000 WL 34334583 (N.D. Cal. Mar. 31, 2000) ...20, 23

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000) ..................................................................... 20

*Alholm v. American Steamship Co.*,
    144 F.3d 1172 (8th Cir. 1998) ....................................................................... 33

*Atmel Corp. v. Silicon Storage Technology, Inc.*,
    76 Fed. Appx. 298, 315 (Fed. Cir. 2003) ...................................................... 14

*Baden Sports, Inc. v. Kabushiki Kaisha Molten*,
    No. C06-210 (MJP), 2007 WL 2790777 (W.D. Wash. Sep. 25, 2007) ......16, 23

*Broadcom Corp. v. Qualcomm, Inc.*,
    No. SACV 05-467-JVS (RNBx),
    2007 WL 2326838 (C.D. Cal. Aug. 10, 2007)..........................................19, 20

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
    977 F.2d 1555 (Fed. Cir. 1992) ....................................................................... 9

*Cargill, Inc. v. Sears Petroleum & Transportation Corp.*,
    388 F. Supp. 2d 37 (N.D.N.Y. 2005) ............................................................. 32

*Cybor Corp. v. FAS Technologies, Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998).............................................................4, 15, 20

*Delta-X Corp. v. Baker Hughes Production Tools, Inc.*,
    984 F.2d 410 (Fed. Cir. 1993)...............................................................5, 15, 21

*Ebay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ......................................................................................... 2

iii

Table of Authorities
(continued)

Page

*Floe International, Inc. v. Newmans' Manufacturing Inc.*,
  No. Civ. 04-5120  (DWF/RLE),
  2006 WL 2472112 (D. Minn. Aug. 23, 2006) ..........................................16, 24

*Franklin Electric Co. v. Dover Corp.*,
  No. 05-C-598-S, 2007 WL 5067678 (W.D. Wis. Nov. 15, 2007).................. 17

*Gustafson, Inc. v. Intersystems Industrial Products, Inc.*,
  897 F.2d 508 (Fed. Cir. 1990)................................................................13, 22

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
  No. C-00-20905 (RMW),
  2009 WL 440473 (N.D. Cal. Feb. 23, 2009) ................................. 16, 21, 22, 23

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
  489 F. Supp. 2d 1075 (N.D. Cal. May 16, 2007)........................................... 23

*Isco International, Inc. v. Conductus, Inc.*,
  279 F. Supp. 2d 489 (D. Del. 2003) ............................................................. 32

*Itron, Inc. v. Benghiat*,
  No. Civ. 99-501 (JRT/FLN),
  2003 WL 21402608 (D. Minn. June 16, 2003)..................................16, 20, 23

*Jurgens v. CBK, Ltd.*,
  80 F.3d 1566 (Fed. Cir. 1996)...................................................................... 22

*Kloster Speedsteel AB v. Crucible, Inc.*,
  793 F.2d 1565 (Fed Cir. 1986)...................................................................... 6

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GmbH v. Dana Corp.*,
  383 F.3d 1337 (Fed. Cir. 2004)................................................................... 18

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997)...................................................................... 4

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
  244 F.3d 1365 (Fed. Cir. 2001)................................................................... 20

iv

Table of Authorities
(continued)

*Modine Manufacturing Co. v. Allen Group, Inc.*,
    917 F.2d 538 (Fed. Cir. 1990)..................................................................3, 4, 10

*Odetics, Inc. v. Storage Technology Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999).................................................................4, 5, 14

*Power Mosfet Technologies, L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004)....................................................................... 25

*Propat International. Corp. v. Rpost, Inc.*,
    473 F.3d 1187 (Fed. Cir. 2007)............................................................25, 36, 43

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed Cir. 1992)........................................... 3, 14, 15, 17, 18, 21

*Rentrop v. Spectranetics Corp.*,
    No. 04 Civ. 0101 (PKC), 2007 WL 4224388 (S.D.N.Y. Nov. 26, 2007)........ 19

*ResQNet.com, Inc. v. Lansa, Inc.*,
    533 F. Supp. 2d 397 (S.D.N.Y. 2008)............................................................ 17

*Riles v. Shell Exploration & Production Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)................................................................. 5, 19

*In re Seagate Technology, LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)............................................................10, 12, 17

*Sensonics, Inc. v. Aerosonic Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996)..............................................................25, 36, 43

*State v. Peek*,
    No. A04-1535, 2005 WL 2495773 (Minn. Ct. App. Oct. 11, 2005) ............... 31

*State v. Washington*,
    725 N.W.2d 125 (Minn. Ct. App. 2006) ........................................................ 31

*State Industries, Inc. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985)....................................................................... 22

Table of Authorities
(continued)

*Stevens v. Makitalo*,
   No. C7-01-1791, 2002 WL 1315827 (Minn. Ct. App. Jun. 18, 2002)............ 32

*Technology for Energy Corp. v. Computational Systems, Inc.*,
   Civ. No. 3-89-476, 1992 WL 535791 (E.D. Tenn. July 29, 1992)............32, 33

*Transclean Corp. v. Bridgewood Services, Inc.*,
   290 F.3d 1364 (Fed. Cir. 2002)................................................................. 3, 14

*TruePosition, Inc. v. Andrew Corp.*,
   568 F. Supp. 2d 500 (D. Del. 2008) ............................................................ 24

*Underwater Devices, Inc. v. Morris-Knudsen Co.*,
   717 F.2d 1380 (Fed. Cir. 1983).................................................................... 17

*United States v. Beaman*,
   361 F.3d 1061 (8th Cir. 2004)....................................................................... 31

*United States v. Freisinger*,
   937 F.2d 383 (8th Cir. 1991) ........................................................................ 31

*United States v. Young*,
   470 U.S. 1 (1985) ......................................................................................... 30

*United States. v. Zehrbach*,
   47 F.3d 1252 (3d Cir. 1995).......................................................................... 31

*z4 Technologies, Inc. v. Microsoft Corp.*,
   No. 6:06-CV-142, 2006 WL 2401099 (E.D. Tex. Aug. 18, 2006).................. 10

## STATUTES

35 U.S.C. § 284 ................................................................................................... 3

35 U.S.C. § 285 ...............................................................................................3, 4, 25

28 U.S.C. § 1961(a) ............................................................................................ 2

3193854v.4

Table of Authorities
(continued)

Page

**RULES**

Fed. R. Civ. P. 30(b)(6).....................................................................24, 33, 34, 35

Minn. R. Prof. Conduct 3.4(e) ...........................................................................29, 30

3193854v.4

# INTRODUCTION

Spectralytics has moved for: (1) pre-judgment interest; (2) post-judgment interest; (3) costs; (4) an accounting; (5) a permanent injunction; (6) enhanced damages and (7) attorney fees.  Docket Nos. 379, 388 ("Spectralytics Br.").  None of these issues needs to be considered unless the jury's liability verdict survives Defendants' motion for judgment as a matter of law ("JMOL") or, in the alternative, for a new trial.  If this Court grants JMOL or a new trial on liability, Spectralytics' motion should be denied as moot.

If the liability verdict is upheld, then we agree that Spectralytics is entitled to pre- and post-judgment interest, costs and an accounting.  We do not believe that an injunction is warranted in this case, as Defendants have ceased all infringing activities.  Moreover, Spectralytics is not entitled to enhanced damages or attorney fees, as Defendants mounted substantial challenges to validity and infringement.

1

## ARGUMENT

### I.      INTEREST, COSTS, ACCOUNTING AND INJUNCTION

If the jury's liability verdict survives Defendants' motion for JMOL or new trial, Defendants do not object to Spectralytics' requests for (1) pre-judgment interest at the prime rate, compounded annually; (2) post-judgment interest in accordance with 28 U.S.C. § 1961(a); (3) costs and (4) an accounting.

If the jury's damages verdict is upheld, then Defendants accept Spectralytics' calculation of pre-judgment interest.  If damages are reduced, then pre-judgment interest must be recalculated.

Although Defendants accept the proposition that the prevailing party is entitled to costs, costs are awarded in the Court's discretion and Spectralytics has not yet filed a bill of costs.  Defendants will comment on the propriety of particular costs when, and if, a bill of costs is submitted.

As to Spectralytics' request for a permanent injunction, even if the jury verdict survives JMOL, a prevailing patentee is not granted an injunction as a matter of course.  Spectralytics must sustain its burden under the classic four-factor test for an injunction.  *Ebay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Spectralytics cannot prove that it will be irreparably harmed if an injunction is not granted.  In any event, to obviate the need for an injunction, Norman Noble submits herewith a declaration from Chris Noble (Merrill Decl. Ex. 1)[1] that Norman Noble has ceased all use of the follower design and will not use it in the future.

---

[1] Declaration of Courtland C. Merrill, dated March 30, 2009, filed herewith.

2

## II.    ENHANCED DAMAGES AND ATTORNEY FEES

Spectralytics seeks enhanced damages pursuant to 35 U.S.C. § 284 as a "punitive" measure, supposedly in light of "Defendants' willful conduct."  Spectralytics Br. at 26.   Spectralytics further asks for attorney fees pursuant to 35 U.S.C § 285 because this is an "exceptional case" in light of the "jury's finding of willful infringement," and Defendants' litigation conduct.  *Id*. at 10-13.  These requests should be denied.  Even if the court upholds the jury's verdict, there is no basis for an award of enhanced damages or attorney fees where, as here, Defendants presented substantial good faith defenses.

Spectralytics' brief presents its arguments in atypical fashion.  It argues for attorney fees separate from, and before, enhanced damages and it addresses the standards of *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed Cir. 1992), only with respect to enhanced damages (and then only in perfunctory fashion).  In fact, the *Read* standards govern both issues and the case law typically considers them together.  Moreover, the courts typically focus first on whether the defendant presented substantial defenses and whether the evidence of willfulness was strong.  We deal with the issues in that fashion below.

### A.    A Finding of Willfulness Does Not Mandate Either Enhanced Damages or Attorney Fees

An award of enhanced damages and attorney fees is entirely inappropriate in this case.  A finding of willful infringement merely "***authorizes***, but does not ***mandate***, an award of increased damages."  *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) (emphasis added); *see also Transclean Corp. v. Bridgewood Servs.*,

3

*Inc.*, 290 F.3d 1364, 1377-78 (Fed. Cir. 2002) (quoting *Modine*); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

The same is true for attorney fees.  A trial court has discretion to award fees in patent litigation to the prevailing party "in exceptional cases."  35 U.S.C. § 285.  While a jury verdict of willful infringement can support the finding that a case was exceptional, "the decision whether or not to award fees is still committed to the discretion of the trial judge."  *Modine*, 917 F.2d at 542 (upholding trial court's denial of attorney fees, despite jury's finding of willful infringement).  This is because the "trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser."  *Id.* (quoting *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986)).

Cases are legion where the Federal Circuit has affirmed the denial of enhanced damages and attorney fees, despite a jury verdict of willful infringement.  Typically, the reason for the denial is the court's conclusion that the case was close and that the defendant presented substantial good faith defenses.  For example, in *Laitram Corp. v. NEC Corp.,* 115 F.3d 947, 955 (Fed. Cir. 1997), the Federal Circuit found "neither clear error . . . nor an abuse of discretion" in the trial court's denial of enhanced damages and attorney fees where defendant "presented a good faith defense against willfulness and a substantial challenge to infringement."

Likewise, in *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1460-61 (Fed. Cir. 1998), the Federal Circuit upheld the trial court's denial of attorney fees and

enhanced damages, despite a finding of willful infringement.  The Federal Circuit said

that, even though the defendant was found to infringe all twenty claims asserted against

it, "this result does not mean that the case was not close, particularly in light of the

justifiable albeit unsuccessful arguments" made by defendants.  *Id*.; *Riles v. Shell

Exploration & Prod. Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002) (holding trial court did

not abuse discretion in denying enhanced damages in "hard-fought" case where

"infringement, damages, and willfulness were close questions."); *Odetics*, 185 F.3d at

1274 (finding no abuse of discretion in denying enhanced damages, despite jury verdict

of willful infringement where defendant "mounted a good faith and substantial challenge

to the existence of infringement"); *see also Delta-X Corp. v. Baker Hughes Prod. Tools,

Inc.*, 984 F.2d 410, 413-414 (Fed. Cir. 1993) (affirming denial of enhanced damages,

attorney fees and costs where defendant in good faith concluded that its device did not

infringe and maintained a substantial challenge to infringement).

It would thwart the strong public interest in the vibrancy of our patent

system, which encourages legitimate challenges to the validity of patents, to award

enhanced damages and attorney fees against a  defendant who has mounted a substantial

good faith case.  As the Federal Circuit has stated:

> We join the district court's concern that awards of increased
> damages and attorney fees not be allowed to thwart efforts to
> challenge the validity of patents believed in good faith to be
> invalid.  A party who has obtained advice of competent
> counsel, or otherwise acquired a basis for a *bona fide* belief
> that a patent is invalid, can be said to serve the patent system
> in challenging that patent in a lawsuit conducted fairly,
> honestly, and in good faith.  Such a party should not have
> increased damages or attorney fees imposed solely because a

5

> court subsequently holds that belief unfounded, particularly
> when the issues may be fairly described as "close."

*Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1581 (Fed Cir. 1986).

**B.    Defendants Mounted a Good Faith Defense and
Should Not Be Punished for Challenging the '277 Patent**

In this case, Defendants asserted serious invalidity and noninfringement

defenses.  This Court repeatedly said as much.  This is the reason most cited by the courts

in refusing to enhance damages or award attorney fees.

As to obviousness, the Court first noted the strength of Defendants'

obviousness case at the summary judgment phase.  Both parties moved for summary

judgment on obviousness, and both were denied.  Docket No. 151.  Nonetheless, the

Court noted that Defendants' motion was "far stronger" than Spectralytics', *id.* at 42, that

"Cordis will likely prevail on this issue at trial," *id.* at 4, and that obviousness was a

"close question."  *Id.* at 47.

At trial, Defendants' case "only got[] stronger."  Tr. 2840.  Defendants

discovered and presented significant prior art that was never considered by the Patent

Office, *e.g.*, the Swiss-style machines, the seminal Palmaz '665 patent and the 1995 RMS

laser-cutting machine.  In light of this art, Spectralytics was forced to reduce the scope of

the claimed invention from the invention of cantilever support (as claimed in the patent,

Tr. 429) or the use of cantilever support with a laser (as claimed on summary judgment,

Docket No. 123, at 19) to merely the location of the attachment of the bushing.  And then

Spectralytics' expert Patrick Madsen admitted that that location was itself obvious:

> Q:      Basically I think what you have told us [is] that if your
>         only goal, your only goal is to attain a fixed spatial
>         relationship between the bushing and the laser, then
>         attaching it to the laser is just as obvious as attaching it
>         to the shelf or attaching it down, right?
>
> A:      If that's your only goal.
>
> Q:      Yes?  The answer is yes?
>
> A:      Yes.

Tr. 2733.

After this crucial concession and in response to Defendants' JMOL motion

at the end of Spectralytics' case, the Court again recognized the force of Defendants'

obviousness case:

> All right. Thank you, Mr. Diskant.  You are correct that my
> strong instinct is to send it to the jury. We have finished the
> testimony.  The jury is a day away from getting the case.  I'm
> not going to take the invalidity case away from the jury.
>
> I have to say, however, I have thought all along, from day
> one, that **you have a strong obviousness case.  I think it has
> only gotten stronger during the trial**.  If the jury should for
> some reason find that this is not obvious, I would certainly
> entertain a motion for a JMOL motion at that point.

Tr. 2840 (emphasis added).

If the Court upholds the jury's verdict of non-obviousness, it should, at the

least, recognize that Defendants presented substantial and good faith arguments to the

contrary.

Infringement in this case was also hotly contested.  Although the Court

accepted Spectralytics' proposed claim construction, it denied summary judgment,

finding that there were genuine issues for trial.  At trial, under the Court's claim

7

construction, Defendants presented what the Court termed "a very good argument," Tr. 467, even though Spectralytics successfully moved to exclude their noninfringement expert.  Instead, Defendants built their case on concessions from Spectralytics' witnesses and standard texts.

Thus, Spectralytics' expert Madsen acknowledged that the patent requires a clearance fit, Tr. 1051-52, a standard term that requires clearance at all tolerances between mating parts.  Tr. 1060.  Madsen then admitted that, based on the bushing and tubing tolerances, there is not a "clearance under all tolerance conditions" in the Norman Noble system.   Tr. 1103-04, 1131.  Based on these concessions, and using definitions from the Machinery's Handbook:  A Reference Book for the Mechanical Engineer, Draftsman, Toolmaker and Machinist, P-243, that Madsen acknowledged were standard, Tr. 1039, Defendants argued that Spectralytics failed to prove that the bushing's inner diameter is "slightly greater than" the tubing's outer diameter on a scale that mattered to one of skill in the art.

Defendants' reliance on standard terms used in the art and documented in the literature was in strict accord with the Court's claim construction.  Meanwhile, Spectralytics veered far afield.  As the Court noted, agreeing with Defendants, the term "slightly greater than" is not a functional term:

> Slightly greater than so as to or so that, and it included a functional element to the definition. ***This doesn't.  It's purely structural as Mr. Diskant said on cross.  It's purely in spatial terms.  It's not written functionally.***  I understand why you want to rewrite it that way and you wish the patent lawyer had written it that way, but it isn't written that way.

Tr. 1158 (emphasis added).

Nonetheless, Spectralytics' case was premised on the argument, which the Court termed "silly," Tr. 2868, that if the bushing functioned as a bushing, the patent must be infringed.  Thus, Madsen testified that "any person of ordinary skill in the art would know that the sized to be language was met simply by virtue of the fact that it was used as a bushing."  Tr. 2656-57.   In closing, Spectralytics stated that "[i]f that tube slides in the bushing, the bushing is slightly greater than."  Tr. 3012.

If the Court upholds the verdict of infringement based on such arguments, it should at the least agree that Defendants' arguments to the contrary were in good faith and substantial.

C.     **The Evidence of Willful Infringement
Was Exceedingly Weak**

Defendants have moved to set aside the verdict on willfulness because the evidence put forth by Spectralytics is too slender to support a finding by clear and convincing evidence of willful infringement.  Docket No. 390 ("Defs.' JMOL Br."), at 41-44.  But even if that motion is denied, the evidence of willfulness is still too slender to support enhanced damages or attorney fees.  The Federal Circuit has recognized that where the weight of the evidence supporting a finding of willfulness is weak (even if sufficient to sustain a verdict of willfulness), enhanced damages and fees should not be awarded.  *See Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1582 (Fed. Cir. 1992) (affirmance of denial of enhanced damages and attorney fees despite finding of willfulness where "the evidence supporting the jury's finding . . . is ***not of the***

9

**weight and strength that would support the imposition of enhanced damages**.")

(internal quotation marks omitted); *see also Modine,* 917 F.2d at 543 (holding denial of

enhanced damages appropriate where the question of willfulness was "sufficiently close

on the evidence"); *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL

2401099, at *25 (E.D. Tex. Aug. 18, 2006) ("a court can refrain from awarding enhanced

damages in light of a finding of willfulness based on the weight of the evidence

supporting willfulness").  That is exactly the case here.

   The evidence supporting the conclusion that Defendants acted "despite an

objectively high likelihood that [their] actions constituted infringement of a valid patent"

is near to non-existent.  *In re Seagate Tech, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

   First, Spectralytics argues that Cordis was aware of the '277 patent before

its 2004 letter to Cordis.  Looking at the evidence in the light most favorable to

Spectralytics, there is evidence that **someone** at Johnson & Johnson was aware of the '277

patent before 2004, but no evidence that any such person knew anything about how

Norman Noble manufactured stents.  This is the fatal disconnect in Spectralytics'

argument.  The evidence, viewed most favorably to Spectralytics, does not suggest that

prior to 2004 anyone at Cordis was even aware that the '277 patent presented an issue of

infringement – let alone aware of an "objectively high likelihood that its actions

constituted infringement of a valid patent."

   Thus, it is true that the '277 patent was listed in a December 1998 Patent

Summary Report.  Spectralytics Br. at 11; Tr. 1170; P-142.  But there is no evidence who

received this report and, in particular, no evidence that anyone who was aware of the

Noble follower design received the report.  P-142.  The only evidence on this issue is probative of nothing:  "Cordis has no knowledge regarding whether any individual saw the reference to the '277 patent in the December 1998 Patent Summary Report or relied upon it in any way."  Tr. 1170.

It is likewise true that the '277 patent was provided in August 2000 as part of a prior-art search to Henry Collins, a Johnson & Johnson attorney.  Collins referred to the '277 patent in an application filed in June 2001.  Tr. 1171; Spectralytics Br. at 11.  But Collins worked for Johnson & Johnson, not Cordis, and there is no evidence that Collins knew about the follower design or any issue of potential infringement of the '277 patent.

The patent Collins was working on, the Mitelberg patent, mentions the '277 patent, and Spectralytics continues to misrepresent his discussion of the patent as supposedly extolling the '277 patent as disclosing an exemplary way to cut stents.  Spectralytics Br. at 11.  However, as Madsen confirmed, the Mitelberg patent favorably describes prior-art lathe designs, not the design of the '277 patent.  Tr. 1030.  And, in any event, even if Spectralytics' reading of the patent were colorable, it still does not demonstrate that anyone at Cordis was, or should have been, concerned that it was infringing the patent.

Coming finally to 2004, Spectralytics did allege infringement directly to J&J and Cordis was aware at that time of the allegation.  But Spectralytics' 2004 correspondence with J&J does not evidence willfulness.  P-77 to P-80; Spectralytics Br.

at 11-12.  In fact, the exchange of correspondence supports Cordis' objective good faith

and nothing else.   As Paul Coletti explained to Spectralytics:

> As you may already know, ***Johnson & Johnson has cut its
> stents by laser for quite some time prior to the priority date
> of the Gustafson patent***. . . .
>
> In this regard, ***it is apparent to us that no matter the scope of
> the Gustafson claims, they cannot possibly cover methods or
> apparatuses which were in the public domain from a time
> well prior to the priority date of Gustafson.***  We would be
> willing to share with you our knowledge about particular laser
> cutting apparatuses for sale in the United States prior to
> October 1996 . . . .
>
> Moreover, ***we were somewhat surprised by the lack of
> relevant prior art which had been submitted to the U.S.
> Patent Office during the prosecution of the Gustafson
> patents.  In our opinion, there is art which would have been
> highly relevant to the prosecution of these patents***.

P-79 at 2 (emphasis added).  Nothing about this exchange of correspondence remotely

supports the argument that Cordis acted in bad faith.  To the contrary, Coletti's letter

recites, in effect, the same defense that Cordis presented at trial.

After receipt of notice of Spectralytics' claim, the Defendants defended the

claim on the merits, as the law permits.  For there to be willful infringement, there must

be clear and convincing evidence of an "objectively high likelihood that [Defendants']

actions constituted infringement of a valid patent."  *Seagate*, 497 F.3d at 1371.   In light

of the strong defenses presented at trial – mirroring the strong defenses asserted to

Spectralytics from the outset of this dispute – the Court should recognize that, even if it

upholds the jury's verdict of willfulness, this case is far too close to warrant enhanced

damages or attorneys' fees.

In support of its claim for enhanced damages and attorney fees, Spectralytics points to post-notice conduct, principally consisting of Defendants' refusal either to pay Spectralytics or to implement a design-around.  But Defendants have a right to contest Spectralytics' claims and they have no legal duty to switch to another design while the legitimacy of Spectralytics' claims are being contested.  *See Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) (stating that a party exercising due care "may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis along a willful infringer.  That such a defense proves unsuccessful does not establish that infringement was willful.").

Indeed, Defendants' continued reliance on the follower design after the institution of litigation is more consistent with a belief in their ultimate success in the litigation than evidence of willful infringement.  Spectralytics implausibly claims that Defendants resisted a design-around "because, as one of the former Cordis executives testified, going without production meant losing sales and customers that they would never get back."  Spectralytics Br. at 11-12.  But as the footnote to this statement admits, the quotation is wildly out of context.  The comment relates to 1994 (not 1998) problems with RMS.  Tr. 2491-93.  It does not relate to 2004, after notice of Spectralytics' claim, at a time when manufacturing had switched to Norman Noble.

In 2004, Noble could have switched to the modified, noninfringing follower design in a matter of days if it had been concerned about the '277 patent.  In light of the strong defenses presented at trial and the ease of implementing a design-around, Noble's

13

continued use of the follower design after notice of Spectralytics' claim is evidence not of willfulness, but of a good faith belief that Defendants were not infringing a valid patent. If the Court upholds the willfulness verdict, it should recognize that the evidence of willfulness is weak, not warranting enhanced damages or attorneys' fees.

  **D.**  **The *Read* Factors Confirm That There Is No Basis to Enhance Damages or Award Attorney Fees**

  Because a finding of willful infringement does not mandate enhancement of damages, district courts consider the nine factors outlined by the Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed Cir. 1992), "in evaluating the degree of the infringer's culpability and in determining whether to exercise [their] discretion to award enhanced damages and how much damages should be increased." *Id.* at 828; *see also Atmel Corp. v. Silicon Storage Tech., Inc.*, 76 Fed. Appx. 298, 315 (Fed. Cir. 2003) (affirming district court's holding that "taking all the *Read* factors into account, there was nothing to suggest that the case was so egregious as to merit the award of attorney fees"); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1377-79 (Fed. Cir. 2002) (affirming denial of enhanced damages and attorney fees based on the trial "court's careful analysis of the *Read* factors"); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999) (affirming denial of enhanced damages and attorney fees when "district court provided detailed reasons for the denial," closely tracking the *Read* factors).

  Spectralytics' cursory discussion of these factors seriously misrepresents both the nature of the inquiry and the trial record. A fair evaluation of the *Read* factors,

in the context of this case as a whole, strongly militates against granting enhanced

damages and attorney fees.

### 1.   *Read* Factor #1: No Deliberate Copying of the '277 Tooling

Spectralytics begins its argument under the *Read* factors by stating that the

first factor, "whether the infringer deliberately copied the ideas or design of another," 970

F.2d at 827, "*favors* enhancement" of damages because Noble "had access to

Spectralytics' idea and used that idea."  Spectralytics Br. at 23 (emphasis added).  But, as

Spectralytics recognized at trial, the Noble follower design is not a copy of the

commercial embodiment of the '277 patent.  There is no copying here, either as a

secondary consideration of obviousness or as a *Read* factor.

Spectralytics has played fast and loose with its copying allegations

throughout this case.  At trial, Spectralytics disclaimed that it was alleging copying.  Tr.

797, 2976, 2983.  Both Oberg and counsel admitted that the follower design "doesn't look

like ours.  It's not a copy of ours."  Tr. 2983; *see also* Tr. 611-12.  After that, the Court

prohibited Spectralytics from arguing copying.  Tr. 1999.  Yet here, as it did in closing,

*see* Defs.' JMOL Brief at 26-30, Spectralytics alleges copying nonetheless.

Where, as here, evidence of copying is "weak" or nonexistent, enhanced

damages are inappropriate.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1461 (Fed.

Cir. 1998) (affirming denial of enhanced damages, despite a finding of willfulness, where

district court found evidence of copying "weak"); *Delta-X Corp. v. Baker Hughes Prod.*

*Tools, Inc.*, 984 F.2d 410, 414 (Fed. Cir. 1993) (affirming denial of enhanced damages where "the trial record showed no copying" of plaintiff's patent).

In a case directly on point, the court in *Itron, Inc. v. Benghiat*, No. Civ. 99-501 (JRT/FLN), 2003 WL 21402608 (D. Minn. June 16, 2003), denied enhanced damages after addressing the *Read* factors, including whether there was deliberate copying.  The court ruled that plaintiff must prove that the defendant "copied the commercial embodiment of a patent."  *Id.* at *8.  Plaintiff's claims that defendant "had access to information from which it could have copied" was "mostly speculation" and did not support the charge of copying.  *Id.*

There is nothing more here.  Oberg could not recall what he allegedly showed to the Nobles, Tr. 586-87, or even if they could understand what was supposedly shown to them.  Tr. 603-04.  Noble's follower design is not a copy of Spectralytics' commercial embodiment.  The copying charge rests on counsel's argument that "it's just too huge of a coincidence that these two companies come up with the same idea where one of them has been at the other one."  Tr. 2999.  This is, at best, an "inference of copying [which] rests on an improper application of the principles of probability, ***and therefore it is meaningless***."  *Hynix Semiconductor, Inc. v. Rambus, Inc.*, No. C-00-20905 (RMW), 2009 WL 440473, at *3 (N.D. Cal. Feb. 23, 2009) (emphasis added); *see also Baden Sports, Inc. v. Kabushiki Kaisha Molten*, No. C06-210 (MJP), 2007 WL 2790777, at *4 (W.D. Wash. Sep. 25, 2007) ("The Court will not draw unsupported inferences from gaps in the evidence presented."); *Floe Int'l, Inc. v. Newmans' Mfg. Inc.*, No. Civ. 04-5120 (DWF/RLE), 2006 WL 2472112, at *2 (D. Minn. Aug. 23, 2006)

(rejecting plaintiff's copying argument as too speculative where defendant corporation's president admitted he saw patented device at trade show and sold infringing device a year later).

### 2. *Read* Factor #2: Investigation and Good Faith Belief of Invalidity or Non-Infringement

The second *Read* factor is "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed." *Read*, 970 F.2d at 827.  This factor is based on the affirmative duty of due care imposed by *Underwater Devices, Inc. v. Morris-Knudsen Co.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983) ("Where . . . a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing.").

This standard was overturned by *Seagate*:  "We overrule the standard set out in *Underwater Devices*" and "abandon the affirmative duty of due care."  497 F.3d at 1371.  Thus, this factor is irrelevant to the issue of willfulness and whether damages should be enhanced.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 533 F. Supp. 2d 397, 420 (S.D.N.Y. 2008) (finding no willful infringement where, under *Seagate* standard, plaintiff "pointed to no evidence of objective recklessness, but instead relied only on subjective evidence"); *Franklin Elec. Co. v. Dover Corp.*, No. 05-C-598-S, 2007 WL 5067678, at *8 (W.D. Wis. Nov. 15, 2007) (holding that "*Seagate* holds irrelevant to the objective inquiry" evidence of "the defendant's knowledge and state of mind").

In any event, Spectralytics' arguments on this subject are either untrue or improper.  In the untrue category, Spectralytics asserts that "Defendants never produced or relied on any evidence that they investigated the scope of Spectralytics' patent," Spectralytics Br. at 24.  This assertion is belied by Coletti's letter to Spectralytics' counsel:

> [I]t is apparent to us that no matter the scope of Gustafson claims, they cannot possibly cover methods of apparatuses which were in the public domain from a time well prior to the priority date of Gustafson.  We would be willing to share with you our knowledge about particular laser cutting apparatuses for sale in the United States prior to October 1996.

P-79 at 2.

In the improper category, Spectralytics argues that Defendants never proffered evidence "that they received an opinion from counsel that the patent was not infringed or invalid."  Spectralytics Br. at 24.  This is an attempt to draw an adverse inference from Defendants' refusal to waive privilege.  This improper argument – which already led to a curative instruction at trial, Tr. 3024-25 – is inconsistent with the Court's decision upholding Defendants' reliance on privilege and excluding such arguments.  Docket No. 298 at 7; *see Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) (en banc) ("The adverse inference that an opinion was or would have been unfavorable, flowing from the infringer's failure to obtain or produce an exculpatory opinion of counsel, is no longer warranted.").

### 3.   *Read* Factor #3: Defendant's Behavior
   As a Party to the Litigation

Spectralytics argues that the third *Read* factor, the infringer's behavior as a party to the litigation, supports the enhancement of damages.  Spectralytics Br. at 24. Spectralytics asserts that Defendants' litigation behavior "added to the cost of the litigation."  *Id.* at 24.  As is further developed below, Cordis and Noble fought hard to defend their clients from a weak lawsuit, but one in which the monetary stakes were high. Zealous advocacy of a good faith defense is not improper, and it certainly does not constitute egregious behavior.  *See Rentrop v. Spectranetics Corp.*, No. 04 Civ. 0101 (PKC), 2007 WL 4224388, at *2 (S.D.N.Y. Nov. 26, 2007) (finding no party misconduct, evaluating *Read* factor, where "litigation was hard fought and [defendant] was aggressive in its defense of its position"); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002) (affirming denial of enhanced damages where the trial court "weighed [defendant's] litigation behavior and found no reason for an award of enhanced damages").

### 4.   *Read* Factor #4: Defendant's Size
   and Financial Condition

Spectralytics argues that the fourth *Read* factor, the defendant's size and financial condition, supports the enhancement of damages.  Spectralytics Br. at 24.  The defendant's size and financial condition is indeed a *Read* factor, but "[u]nlike the other factors, it has no bearing on egregiousness."  *Broadcom Corp. v. Qualcomm, Inc.*, No. SACV 05-467-JVS (RNBx), 2007 WL 2326838, at *2 n.1 (C.D. Cal. Aug. 10, 2007). The defendant's financial well-being "is not a reason to punish a willful infringer, but

*may be a reason not to punish one*." *Id.* (emphasis added); *see also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C-95-03577 (DLJ), 2000 WL 34334583, at *15 (N.D. Cal. Mar. 31, 2000) (rejecting the "obligatory argument that you cannot get the 'attention' of a giant company without a giant award. . . . [T]he Court is not persuaded that it has much force in the willful infringement world").

Spectralytics' argument based on Cordis' and Norman Noble's revenues is therefore inapposite. *Itron*, 2003 WL 21402608, at *10 ("Enhanced damages are designed to punish based on culpability. . . . They are not an automatic sliding scale based on ability to pay.").

5.     *Read* **Factor #5: Enhanced Damages and Attorney Fees Are Improper in "Close" Cases**

Spectralytics argues that "[i]t strains credibility for Defendants to assert that the infringement issue in this case was close" and asserts that "the validity issue in this case was not close either." Spectralytics Br. at 24. As discussed above and in their JMOL brief, Docket No. 390, Defendants advanced substantial defenses to both validity and infringement. The closeness of the case is a *Read* factor that often times results in a denial of enhanced damages or attorney fees. *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) ("Given the closeness of the case and the discretionary nature of its decision, we affirm the district court's denial of [plaintiff's] motion for enhanced damages and attorney fees."); *Cybor Corp.*, 138 F.3d at 1461 (affirming denial of enhanced damages, finding that case was close "in light of [defendant's] justifiable albeit unsuccessful arguments"); *Ajinomoto Co. v. Archer-*

20

*Daniels-Midland Co.*, 228 F.3d 1338, 1352 (Fed. Cir. 2000) (defendants "mounted a substantial, albeit unsuccessful, challenge on the issues of validity and infringement"); *Delta-X Corp.*, 984 F.2d at 414 (affirming denial of enhanced damages where defendant "mounted a substantial challenge to infringement").

### 6. *Read* Factor #6: Duration of Defendant's Misconduct

The duration of a defendant's infringement also bears on the enhanced damages inquiry. *Read,* 970 F.2d at 927. Spectralytics argues that Noble "willfully infringed Spectralytics' patent for more than 9 years." Spectralytics Br. at 24. This oversimplified argument fails because there was no determination of infringement and nonobviousness until two months ago and because, as noted above, Defendants mounted serious good faith defenses, which are still being adjudicated.

In assessing this *Read* factor, "the court must parse the infringement for significant milestones, like the entry of judgment or affirmance on appeal." *Hynix*, 2009 WL 440473, at *4. Under *Hynix*, the Court must consider when infringement was determined, and gauge willfulness accordingly. The *Hynix* plaintiff argued that the defendant's "decade-long" infringement supported enhanced damages. The court rejected this argument, noting that although the jury rendered its verdict in 2006, the court did not review the defendant's post-trial motions until 2009. *Id.*

Spectralytics first alleged infringement in 2004, P-77, and filed its complaint a year later. Docket No. 1. The Court rejected Spectralytics' motion for summary judgment on validity and infringement in September 2008, Docket No. 151, and noted that Defendants presented "strong evidence" of invalidity and would "likely

21

prevail" at trial.  *Id.* at 48, 4.  The jury delivered its verdict in February 2009, Docket No. 369, and post-trial briefing is still ongoing.  Therefore, the duration of infringement is "not as culpable as suggested" by Spectralytics.  *Hynix*, 2009 WL 440473, at *4.

### 7.    *Read* Factor #7: Remedial Action by the Defendant

Spectralytics argues that Defendants did not take appropriate remedial action because they never sought a license or attempted to settle.  Where a defendant has strong defenses, it is altogether proper in our system to rely on those defenses and seek to prevail at trial.  Asserting legitimate defenses is not grounds for enhancing damages or awarding fees.

It is well established that a defendant exercising due care need not cease allegedly infringing activities during a litigation.  *See Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) (stating that a party "may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis along a willful infringer"); *see also Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996) (where party continuing activity "is subsequently found to be infringing another's patent despite its investigations, it will be liable only for compensatory damages, not increased damages"); *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1237 (Fed. Cir. 1985) (where defendant acted in good faith and presented nonfrivolous defenses, defendant's continued sale of its product "while the suit was in progress was [not] to be given any weight in determining 'willfulness.'")

Nonetheless, during the pendency of this suit, Noble did switch to a revised follower design that connects the bracket to the shelf and it has now ceased all use of the

22

original follower design, despite the fact that Defendants are still contesting the jury's verdict.  Courts have held that this *Read* factor does not support enhanced damages where the defendant is "vigorously pursuing its right to contest the verdict."  *Acumed LLC v. Stryker Corp.*, No. 04-CV-0513-BR, 2006 WL 3409074, at *5 (D. Or. Apr. 17, 2006). Additionally, a court need not place weight on this factor where the other *Read* factors do not support enhancing damages.  *See Hynix*, 2009 WL 440473, at *4; *see also Advanced Cardiovascular Sys.,* 2000 WL 34334583, at *15 (diminishing weight of remedial action factor, acknowledging that "[t]he weight of these factors . . . is obviously a function of the reasons for continued conduct").

### 8.    *Read* Factor #8: Defendant's Motivation for Harm

There is no evidence that Defendants were motivated to harm Spectralytics. In fact, no harm occurred.  Spectralytics did not even view Noble as a competitor and it described Noble's exclusivity agreement with Cordis as a "golden opportunity" for Spectralytics to expand its business.  D-628, at SP 00119.  Even if Noble and Spectralytics were competitors, courts have held that a defendant's "desire to remain competitive in the marketplace" is not indicative of motivation to harm a specific competitor and "actually mitigate[s] the infringer's culpability."  *Itron*, 2003 WL 21402608, at *12 (citing *Am. Safety Table Co. v. Schreiber,* 415 F.2d 373, 378 (2d Cir. 1969)); *see also Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 489 F. Supp. 2d 1075, 1085 (N.D. Cal. May 16, 2007) (holding motivation to harm factor "neutral" because "aggressive attempts to compete are not, by themselves, evidence of bad faith"); *Baden Sports,* 2007 WL 2790777, at *6 ("evidence that [defendant] Molten hoped to

increase its own market share does not indicate that Molten intended to harm [plaintiff] Baden specifically.  This factor does not benefit Baden.").

        **9.**     *Read* **Factor #9: Whether Defendant Attempted
to Conceal Its Misconduct**

Where a defendant does not attempt to conceal its misconduct, enhanced damages are not supported.  *See Floe*, 2006 WL 2472112, at *6; *TruePosition, Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 529 (D. Del. 2008).  Spectralytics relies here on the late production of the process parameter checklists.  But there was no attempt to conceal anything.  As is discussed more fully below, Spectralytics was aware long before trial of the very facts it claims were concealed.  The Court recognized as much:  "There has never been anything remotely secret about any of this."  Docket No. 271 ("Pre-Trial Conf. Tr.") at 18.  During discovery, Defendants produced the process parameter checklist, but objected to production of all completed forms as unduly burdensome.  Spectralytics never followed up.  Later Defendants ***voluntarily*** produced the completed checklists.   That is hardly concealment.

       **E.**      **Defendants' Litigation Conduct Does Not Warrant
an Award of Fees**

The remainder of Spectralytics' brief is directed to arguing that it is entitled to attorney fees based on Defendants' litigation conduct.  Spectralytics Br. at 13-21.  It argues that Defendants (1) continued to press non-infringement arguments at trial that were contrary to the Court's claim construction; (2) made "frivolous" discovery objections; (3) improperly vouched for the merits of their case; and (4) failed to produce an appropriate witness in response to a 30(b)(6) notice.  According to Spectralytics, this

conduct "combined with Defendants' transparent effort to overwhelm Spectralytics with lawyers at trial," somehow increased the fees that Spectralytics was required to pay and justifies an award of attorney fees.  Spectralytics Br. at 13.

Spectralytics' allegations of misconduct by Defendants are unfounded. Defendants litigated this case cleanly and within the bounds of the law, while dealing with an extremely difficult and uncooperative opponent.  Meanwhile, Spectralytics comes to the Court with unclean hands; it itself has engaged in misconduct throughout this case. Where the party requesting attorney fees is itself guilty of misconduct, attorney fees will not be awarded.  *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004).

Indeed, even if Spectralytics' allegations of litigation misconduct by Defendants were true, which they are not, where both parties engage in similar behavior, courts tend to "leave the parties where [they] find[] them" and deny attorney fees under § 285.  *Propat Int'l. Corp. v. Rpost, Inc*., 473 F.3d 1187, 1195 (Fed. Cir. 2007); *see also Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996) ("Indeed, the court may consider the litigation actions of both sides in connection with § 285.").

### 1. Defendants Fought a Hard Case and Took Positions That Were Supported by the Facts and the Law

Defendants presented a factually and legally sound case.  A zealous defense based on honest arguments about the noninfringement and invalidity of a patent is not grounds for attorney fees.

### i.    Defendants' Infringement Arguments Were
### Not Contrary to the Court's Claim Construction

Spectralytics contends that Defendants advanced "rejected claim construction arguments" resulting in added time and expense to the litigation. Spectralytics Br. at 13-15.

There was absolutely nothing wrong with the infringement case tried by Defendants.  Defendants proved, and Spectralytics' expert Madsen agreed, that the Noble bushing did not have the clearance fit required by the claim.  Tr. 1103-04.  Thus, the inner diameter of the smallest bushing (within the bushing tolerance) was at no time "slightly greater than" the outer diameter of the largest tubing (within the tubing tolerance).  This is the scale that matters to those of skill in the art and, for this reason, Defendants argued, there was no infringement.

Spectralytics quotes the Court, on the morning of the second day of trial, as saying that Defendants argument was "inconsistent" with its claim construction.  Tr. 236. The comment was not addressed to Defendants' noninfringement case, but rather to the inadvertent use of a double negative in Defendants' opening, for which counsel apologized.  Tr. 237-38.  The issue on the merits was squarely resolved within the next 24 hours.  On the evening of the second day – after the Court's comment in the morning – there was what the Court later termed "a very helpful hour long conversation in chambers."  Tr. 465-66.  As the Court commented the next morning (the third day of trial), up until that point, "I didn't think I really understood the argument that Mr. Diskant was making."  *Id.*

The Court then correctly articulated the defense and observed "it seems to me an awfully good argument on infringement," Tr. 466, "a very good argument, if I am understanding it correctly." Tr. 467. Thereafter, Defendants presented their defense without objection from the Court – or from Spectralytics – and squarely consistent with the Court's claim construction. Defendants have relied on that same defense in their JMOL motion. Defs.' JMOL Br. at 30-36.

Ironically, it was Spectralytics, not Defendants, who ignored the claim construction and argued that any bushing that allowed a tube to slide through is necessarily "slightly greater than" the tube. Spectralytics Br. at 36-41. Although the Court admonished Spectralytics for attempting to "redefine what is a structural term into a functional term," Tr. 1158, Spectralytics tried a functional, rather than a structural, infringement case to the jury. Tr. 2987, 3012 (closing); 1046 (Madsen).

### ii.     Defendants Did Not Engage in Discovery Misconduct

Spectralytics contends that Defendants engaged in "misconduct" by refusing to produce in discovery completed process parameter checklists and by presenting a deposition witness who purportedly gave misleading testimony about them. Spectralytics Br. at 15-16.   The Court has already considered and rejected these arguments.  Pre-Trial Conf. Tr. 18-22.

First, Spectralytics was aware long before trial of all the facts it complains that Defendants attempted to conceal.  As the Court observed in denying Spectralytics' pre-trial Motion for Judgment of Infringement and Sanctions, Docket No. 255:

They knew that the Teflon wears away relatively rapidly, and that as the Teflon wears away, the inner diameter of the bushing gets larger.

They knew that because of the wear that Norman Noble was routinely measuring and recording the inner diameter of the bushing on something called a process parameter checklist. And they knew that Norman Noble was replacing bushings when the clearance exceeded .0003 of an inch.

There has never been anything remotely secret about any of this. It was clearly described by the fact witnesses, and it was clearly described in the expert reports of both sides.

Pre-Trial Conf. Tr. 18-19.   Although Spectralytics "knew of the existence of the [completed] checklists, and it knew of their importance long before the deadline for bringing non-dispositive motions passed," *id.* at 19, Spectralytics made a decision not to pursue the completed checklists in discovery.

The cited deposition testimony does not change the analysis.  Although the Court characterized the response of a Noble witness to a question about documents showing when a bushing was replaced as "cute" (Defendants respectfully disagree with the characterization), the Court also stated that the testimony was "not really untrue."  In fact, the Court said that when "read as a whole," it did not consider "the testimony of defendants' witnesses [to be] nearly as deceptive as Spectralytics claims."  *Id.* at 19-20.

Jeffrey Miller, for example, plainly admitted a[t] his deposition that the inner diameter of the bushing is not always exactly the same size as the outer diameter of the tubing. He admitted that as the bushing wears, the bushing inner diameter will get larger to quote him.

And Ed Przeracki plainly described Norman Noble's daily process of measuring the bushing bores and discarding them when they were no longer within tolerance.

28

*Id. at 20.*

Ultimately, the Court concluded that it "d[idn't] quite understand what Spectralytics [was] complaining about," *id.*, explaining:

> I honestly, Mr. Carlson -- I just don't see what the big deal is on this. You had these forms. They gave you notice that -- you say now this is such critical information. If it was such critical information, you should have found out what was written down on those forms. You had Judge Erickson available to get the forms for you. You chose not to do it. You have made this bed. You have to lie in it.

*Id.* at 12-13.

Spectralytics alleges that the completed process parameter checklists "irrefutably proved infringement." Spectralytics Br. at 15. But the Court's denial of Spectralytics' request for summary judgment based on the checklists proves otherwise. As the Court stated: "the answer is, no, that's a matter of factual dispute that the jury will decide." Pre-Trial Conf. Tr. 13. In fact, at trial, Spectralytics' reliance on the process parameter checklists was secondary to its basic infringement case (which was inconsistent with the Court's claim construction) that if the bushing functioned, it must be "slightly greater than" the tubing. Thus, Madsen stated that the data from the forms merely "confirmed" his opinion that the bushings were "always" slightly greater than the stock tubing. Tr. 959, 2666.

### iii.    Defendants Did Not Improperly Vouch for the Merits of Their Case

Spectralytics argues that Defendants' counsel vouched for the merits of their case in violation of Minnesota Rule of Professional Conduct 3.4(e), which states

29

that "[a] lawyer shall not . . . in trial . . . state a personal opinion as to the justness of a

cause." Spectralytics Br. at 17. Rule 3.4(e) pertains to conduct "in trial," where vouching

may improperly influence a jury. As the Supreme Court has observed, the "dangers"

posed by a lawyer's "expressing his personal opinion" consist in "jeopardiz[ing] the

defendant's right to be tried solely on the basis of the evidence presented ***to the jury***."

(emphasis added). *United States v. Young,* 470 U.S. 1, 18-19 (1985). Yet Spectralytics

relies primarily on statements made by Defendants' counsel to the Court, not to the jury.

As recognized by the Court:

> I hear that kind of stuff all the time. Don't worry about that.
> Ultimately, I may agree with him that it's a frivolous case or
> not, but it will be because of the merits, not because of the
> labels people have attached to it.

Tr. 2558.

The sole allegedly improper statement of opinion that was made to the jury

– "I think these claims are baseless" – came in the course of explaining why Defendants

would be arguing the amount of damages despite their position that there was no basis for

any damages at all. In context, the comment clearly was addressed to the consistency of

Defendants' position – not the strength of counsel's personal convictions.

> Usually defendants don't like talking about damages. Usually
> defendants are scared of talking about damages because it
> suggests they have a weak case. I'm happy to talk about
> damages because it's going to tell you what's wrong with this
> case, which is everything.
>
> ***
>
> So I am going to ask you to reject these claims. I think these
> claims are baseless. But then you are going to have to spend

> some time thinking what would we pay if we accepted the
> claim.

Tr. 2946-47.

Defendants' counsel's use of the pronoun "I" did not transform this

straightforward advocacy of Defendants' position into improper expression of personal

opinion.  As the Eighth Circuit has observed:

> Use of the personal pronoun "I" is a normal and ordinary use
> of the English language. If courts were to ban the use of it,
> prosecutors would indulge in even more legalese than the
> average lawyer, sounding even more stilted and unnatural. . . .
> Of course . . . prosecutors have a duty to refrain from
> suggesting that they know something that the jury does not.
> That does not mean, however, that prosecutors should refrain
> from all use of the pronoun "I."

*United States v. Freisinger*, 937 F.2d 383, 385-386 (8th Cir. 1991), *overruled on other*

*grounds*, *United States v. Beaman*, 361 F.3d 1061, 1064 (8th Cir. 2004).

Plainly, Defendants' counsel never suggested he knew something the jury

did not or otherwise ask the jury to rely on anything but its own view of the evidence,

which he had marshaled from Defendants' perspective.  Accordingly, the comment was

not improper.  *See State v. Washington*, 725 N.W.2d 125, 134 (Minn. Ct. App. 2006)

(holding that "prosecutor's use of the first-person statements did not interject personal

opinion" where there was no "attempt to gain unfair advantage or improperly use the

weight of public office"); *State v. Peek*, No. A04-1535, 2005 WL 2495773, at *3-*4

 (Minn. Ct. App. Oct. 11, 2005) ("[T]he use of "I" statements is not misconduct if the

statements are merely ways of phrasing arguments from the evidence rather than

arguments based on the prosecutor's personal opinion."); *see also United States. v.*

31

*Zehrbach*, 47 F.3d 1252, 1265 n.11 (3d Cir. 1995) ("counsel may state his views of what the evidence shows and the inferences and conclusions that the evidence supports").

The only other comment to the jury about which Spectralytics complains was simply advocacy and did not constitute "vouching" in any sense.   Spectralytics' opening set the tone for what would be a recurring theme:  Defendants should pay damages to Spectralytics not based on merits, but because Johnson & Johnson can afford to pay.  "Johnson & Johnson, can take care of everybody.  They are big."  Tr. 147.  Oberg said he was "here to collect."  Tr. 419, 559, 585.  Cordis' attorney, executing his duty to defend his client vigorously, attempted to refute these blatantly improper comments by pointing out they provided no legal basis to find for plaintiff and that, as a practical matter, Johnson & Johnson cannot pay off every threatened lawsuit.  Tr. 2954.  He said nothing to suggest that he was relying on his own personal opinion rather than the evidence produced at trial.

In any event, the remedy for prejudicial vouching is the grant of a mistrial or new trial, not attorney fees.  *See Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 53 (N.D.N.Y. 2005); *Isco Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 508-09 (D. Del. 2003), *affirmed* 123 Fed. Appx. 974 (Fed. Cir. 2005); *Tech. for Energy Corp. v. Computational Sys., Inc.*, Civ. No. 3-89-476, 1992 WL 535791, at *22-23 (E.D. Tenn. July 29, 1992).  Spectralytics neither objected to Defendants' arguments nor sought a curative instruction.  *See Stevens v. Makitalo*, No. C7-01-1791, 2002 WL 1315827, at *5 (Minn. Ct. App. Jun. 18, 2002) (noting that where there was no objection to vouching or resulting prejudice, court properly denied motion for a new trial); *see also*

*Alholm v. Am. S.S. Co.*, 144 F.3d 1172, 1181 (8th Cir. 1998) (where court sustained

objection in one instance and gave curative instruction to another instance of vouching,

undue prejudice was prevented); *Tech. for Energy Corp.*, 1992 WL 535791, at *23.

Having failed to object at trial to Defendants' wholly proper comments, Spectralytics is

not entitled to attorney fees based on groundless and after-the-fact complaints.

### iv.    Defendants Went Beyond the Burden Imposed on Them Under Fed. R. Civ. P. 30(b)(6)

Finally, Spectralytics alleges that Cordis failed to produce a knowledgeable

30(b)(6) witness regarding the machines and processes used by Cordis' suppliers LPL,

RMS and Norman Noble to make laser-cut stents prior to October 24, 1996.

Spectralytics Br. at 18-22.   In fact, there was no Cordis witness knowledgeable about

these subjects and Spectralytics had ample discovery tools, which it successfully utilized,

to obtain the evidence it sought from those with first hand knowledge.

During discovery, Cordis made every effort to provide Spectralytics with a

knowledgeable and prepared witness on the pre-1996 stent-cutting machines.  However,

as explained by Cordis counsel, "[m]ost of the employees involved in the machines

related to laser cutting of stents left the company many years ago."  May 7, 2007 letter

from R. Jackson to M. Goggins, at 1 ("May 7 Letter") (Merrill Decl. Ex. 2).  Indeed,

Cordis did not get involved in the configuration of the tooling used by its suppliers.  It

was not interested in the specific method and machines used by its suppliers, but rather

focused on the quality of the finished product.  Tomonto Dep. Tr. 437-38 (Merrill Decl.

Ex. 3).  At trial, George Mackaronis explained that Cordis did not care about the

machines its suppliers were cutting stents on "as long as they are meeting specification." Tr. 1694-1695.

Cordis did offer two Cordis engineers, Jay Mason and Charles Tomonto. However, both were 10 years removed from first-hand knowledge of the machines at issue.  Cordis prepared both by having them review hundreds of documents produced in the litigation.  May 7 Letter, at 1.

The irony of the situation is that Spectralytics was seeking knowledge from **Cordis** about its **suppliers**' machinery.  Spectralytics deposed multiple witnesses from those suppliers on the very machines about which it was seeking information from Cordis, *i.e.*, RMS (Dunbar), LPL (Press) and Lasag (Muller).  From the suppliers it received first-hand information that Cordis was never in a position to provide. Spectralytics also took multiple depositions of witnesses from Noble on its laser-cutting development, again a subject on which Cordis had slight knowledge.

There was never any legitimate point to Spectralytics' demand for second- or third-hand information from Cordis via a 30(b)(6) witness about these same machines and it is unfair for Spectralytics to complain now about Cordis' inability to produce a witness to discuss decade-old information that was not within Cordis' first-hand knowledge to begin with.

Spectralytics' argument focuses on Tomonto's lack of "personal knowledge" about third parties' stent-cutting techniques.  However, personal knowledge is not a requirement under 30(b)(6).  Cordis made substantial efforts, *see* May 7 Letter, at 1, to

ensure that Tomonto was able to "testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).

Although Defendants believed that Tomonto had satisfied Cordis' obligations under 30(b)(6), Cordis designated Mason as an additional 30(b)(6) witness "to the extent [of] Mr. Mason's personal experience with specific laser machining centers that he has operated over the years as part of Cordis' R & D group . . . ."  April 21, 2007 email from R. Jackson to M. Goggin (Merrill Decl. Ex. 4).  Contrary to Spectralytics' contentions, Mason testified to his familiarity with the LPL, Com-Tal, Noble and Rofin stent cutting systems, Mason Dep. at 81-88, 120-121 (Merrill Decl. Ex. 5), and explained differences between the Com-Tal and Norman Noble systems.  *Id.* at 36-38, 41-42, 52-53.

Months after deposing Tomonto and Mason, and after the close of fact discovery, Spectralytics filed a motion seeking to compel a further Cordis 30(b)(6) witness.  Again, while Defendants believed they had fully satisfied their obligations under Rule 30(b)(6), they were able to arrange to produce George Mackaronis, who was not a current Cordis employee, but who was a current J&J employee, to give Spectralytics a third bite at the apple.

Rather than illustrating sharp practice during discovery, the actions complained about by Spectralytics demonstrate an effort by Cordis to supply Spectralytics with its desired information.

### 2.    Spectralytics Committed Litigation Misconduct and Therefore Cannot Be Awarded Fees

In seeking attorney fees, Spectralytics ignores its own questionable conduct, which spanned the entire case, from discovery to its closing argument to the jury.  As discussed above, attorney fees are inappropriate where the requesting party has itself engaged in litigation misconduct.  *Propat Int'l. Corp. v. Rpost, Inc*., 473 F.3d 1187, 1195 (Fed. Cir. 2007); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996).  Spectralytics' counsel's improper conduct is addressed in part in Defendants' motion for a new trial.  Defs.' JMOL Br. at 57-61.  Some additional misconduct is discussed below.

### i.    Spectralytics Defeated Summary Judgment with False Allegations

Spectralytics' theories of trade secret theft and copying were constantly shifting.  *See* Defs.' JMOL Br. at 57-58.  Spectralytics argued one theory to survive summary judgment, and then abandoned it at trial as untrue.  Specifically, to defeat summary judgment, Spectralytics argued that Noble visited Spectralytics in 1996 and saw the patented tooling at that time.   It repeated this argument on the eve of trial, again to defeat dismissal, telling the Court that it would "prove at trial that misappropriation occurred in 1996" based on "Oberg's testimony and documentary evidence."  Docket No. 264, at 1, 4.  At trial, its witness acknowledged these representations were untrue.  Oberg admitted that there was no 1996 visit and insisted, contrary to his deposition testimony, that the invention must have existed when the Nobles visited in 1995.  Tr. 589.

The Court recognized this tactic at the pre-trial conference:

In opposing the defendants' [summary judgment] motion, Spectralytics did not in any way suggest or cite any evidence that in fact there was something to steal in August of 1995.

***

Spectralytics then argued that the Nobles came to Minneapolis in December of '95 and February of 1996, and it was on the basis of this evidence that I denied summary judgment.  It was also on the basis of this evidence that I made the statement in the order about the December, 1995 date.

Now, though, Spectralytics seems to have ***shifted its theory***, or at least its emphasis.  In its trial brief, Spectralytics argues that the Nobles stole the trade secrets during the August of 1995 meeting.  It does not say a word in the trial brief about any visit by the Nobles in 1996.

In support of its new theory, Spectralytics argues for the first time that there was something to steal in August of 1995 . . . .

Pre-Trial Conf. Tr. 36-37 (emphasis added).

### ii.    Spectralytics Elicited False Testimony About D-83

At trial, the document most in controversy was D-83, the 1994 drawing produced from the files of RMS that corresponded to Jon Dunbar's testimony that he used a laser-cutting machine with a bushing attached directly to the laser.  In an attempt to cast aspersions on Dunbar's testimony, Spectralytics' counsel elicited false testimony from Madsen to the effect that he had seen no such document in RMS' files – even though Madsen had discussed D-83 extensively both in his expert report and his deposition.  This false testimony was repeatedly elicited before the jury:

> Q:    And based upon what you know, your analysis of this evidence, and what you know from your experience, do you believe that RMS ever made a machine before

the invention of the '277 Patent that had this carried-on feature?

A:   ***I don't believe they did from the documents I have been able to review and the testimony that Mr. Dunbar gave.***

***

Q:   Now, in your experience as an engineer who has worked in corporate environments for many years, are significant developments in the technology documented and recorded so that they can be established later, if necessary?

A:   Yes.

Q:   Now, do you believe that Mr. Dunbar documented and recorded the significant events relating to RMS's development at about the time they occurred in his timeline?

A:   Yes.

Q:   ***So did you see any documentary evidence from RMS that supports an assertion that RMS in 1994, 1995 developed a machine that had a workpiece fixture carried on the cutting tool?***

A:   ***No.***

Tr. 2596-97 (emphasis added).

Q.   Now, is there anything in that timeline or any other documents that you saw that supports the idea that Mr. Dunbar made a machine in which the bushing workpiece fixture was carried on a cutting tool?

A.   ***I have no documentary evidence of that.***

Tr. 2607 (emphasis added).

The Court recognized this testimony for what it was, a blatant untruth.  The

Court explained to counsel:

38

You kept basically taunting him where is the document in RMS's files, where [are] the documents.  This [D-83] is a document in RMS's files.

\*\*\*

The point you are suggesting to the jury is there isn't a document in the RMS files that in any way supports the existence of that.  ***That's not true***.

\*\*\*

You went pretty far in sort of implying to the jury that there is nothing in RMS's files that supports that, ***and that just isn't true***.

Tr. 2757-60 (emphasis added).

### iii.    Spectralytics Elicited False Testimony About Madsen's Review of the Process Parameter Checklists

Madsen testified that he had selected a sample of the process parameter checklists for review.  He swore that the sample he studied was a statistical sample:

Q.    How many pages of process parameter checklists were you given two weeks ago?

A.    1700.

Q.    And have you reviewed those documents?

A.    Yes.

Q.    Have you had a chance to do some analysis of those documents?

A.    Yes.

Q.    Have you done some ***statistical sampling*** and drawn some conclusions from those documents?

A. Yes, I have.

Tr. 945 (emphasis added).

39

This testimony was false.  In fact, he reviewed only two pages of data.  Tr. 2673.  The two pages represented some, but not all, of the data for a single laser during a two-month period.  Tr. 2660-63.  They showed a very low number of days on which the bushing measured .0580, notwithstanding the evidence that the bushing nearly always started out at such a measurement.  *See* D-783.  This false testimony suggested that Noble was not being candid about its procedures for sizing the bushing.

Madsen's false testimony unnecessarily placed on Defendants the burden of rebutting it.  Defendants did so by asking their damages expert, Vincent Thomas, to analyze the data.  The true data vividly demonstrated that Madsen's numbers were not representative.  For instance, whereas Madsen showed measurements of .0580 on only 9.4% of days, the true percentage of daily entries showing that measurement was 37.66%.  D-783, at 1.

### iv.    Spectralytics Attempted to Use the Court's Order As Both a Sword and a Shield

At the pre-trial conference, the Court granted Spectralytics' motion in limine to exclude evidence that RMS considered whether to seek a patent on its stent-cutting machine, but had ultimately decided not to.  Docket No. 289, at 3.  At trial, however, Spectralytics knowingly elicited testimony from Madsen that was intended to create the false impression that no one could have designed such a machine because they would surely have sought to patent it, if they had.

> Q.    Do you believe that if anybody had solved the problem before Mr. Gustafson they would have filed a patent application to stake their claim in the intellectual property?

> A.     Should have.

Tr. 2614.

When Cordis' counsel then sought to correct this unjustifiable inference by proffering evidence that RMS did in fact consider patenting its design, Tr. 2763-64, Spectralytics objected.  Tr. 2764.  The Court overruled the objection and rejected Spectralytics' attempt to leave the jury with this untrue inference:  "I don't know why you guys work so hard to bring motions in limine to get stuff out of evidence and then I rule in your favor and you come here and you open up the topic.  They can't try their case with one arm tied behind their back."  Tr. 2764.

### v.     Unfounded Accusation of Document Destruction

In Spectralytics' brief in opposition to Noble's motion in limine seeking to exclude evidence related to damages for Spectralytics' trade secrets claim, Spectralytics alleged that Norman Noble "seeks to profit from destroying, or hiding," certain financial documents.  Docket No. 243, at 3.  At the pre-trial conference, the Court admonished Spectralytics' counsel for making this serious accusation without the support of any evidence whatsoever:

> You in your brief used the word "destroy."  You said that your opponents destroyed evidence.  You, in fact, have no evidence if that's true; is that correct?
>
> ***
>
> You cannot be throwing allegations around like that, unless you have the evidence to back that up.  I mean, that is not the kind of litigating that I will tolerate in this courtroom.

Pre-Trial Conf. Tr. 48-49.

### vi.   Unfounded Accusation of Unfair Surprise

During the direct examination of Bill Dobbins, Defendants showed trial exhibit D-588.001, an unredacted version of an LPL customer list.  Tr. 2231. Spectralytics' objection to the introduction of this document was sustained.  Tr. 2232-35. During a recess, Defendants explained that the exhibit should be admitted into evidence because it was physically present at Richard Press' deposition and was authenticated.  Tr. 2518.

Spectralytics' counsel then falsely represented to the Court: (1) that Defendants refused to provide the unredacted version of the document at the deposition, (2) that counsel left the deposition "without the answers [he] needed," (3) that Defendants revealed the document to counsel for the first time that morning, (4) that Defendants "clearly" sprung a surprise on counsel "at the last minute," and (5) that fairness required the exclusion of the document from evidence.  Tr. 2518-19.

Every one of these assertions was untrue.  Defendants produced a letter from Spectralytics' counsel in which he had stated that he in fact possessed the unredacted document at the deposition and refused to return it to Defendants.  Tr. 2519. Counsel admitted that his statements were false – that he had supposedly "misremembered" the facts – and the document was admitted into evidence.  Tr. 2519.

### vii.   Baseless Accusation Against the Court

During trial, Spectralytics' counsel blamed *the Court*, rather than themselves, but for the case's "[going] south in terms of its civility."  Tr. 2559. Specifically, counsel suggested that the Court's recognition of the weakness of

Spectralytics' case in its summary judgment ruling was the cause of a supposed lack of

civility.  *Id.*  The Court properly admonished Spectralytics' counsel for this accusation:

> If you are for a moment suggesting it's my fault that, for
> example, your team accused the other team of destroying
> evidence without any basis whatsoever, that is absurd, Mr.
> Carlson.

***

> Courts all the time in summary judgment motions say,
> although, I think that party X has a strong case, I don't think it
> reaches the level of summary judgment.  And the notion that
> that somehow causes people not to act civilly, as they are
> required to do as officers of this court, is preposterous.

***

> I am not going to let you blame me for your team's lack of
> civility in this case.  That's ridiculous.

Tr. 2559-60.

These numerous instances of litigation misconduct make an award of

attorney fees to Spectralytics inappropriate in this case.  *Propat Int'l. Corp. v. Rpost, Inc*.,

473 F.3d 1187, 1195 (Fed. Cir. 2007); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566,

1575 (Fed. Cir. 1996).

## CONCLUSION

For all the reasons set forth above, Spectralytics' motion for enhanced damages and attorney fees should be denied.  If the liability verdict is upheld, Defendants agree that Spectralytics is entitled to pre- and post-judgment interest, costs and an accounting, but do not believe that an injunction is warranted in this case, as Defendants have ceased all infringing activities.

Dated:  March 30, 2009

| | |
|---|---|
| FAEGRE & BENSON LLP | ANTHONY OSTLUND BAER & LOUWAGIE, P.A |

Respectfully Submitted,

*s/John Edward Connelly*
John Edward Connelly (#237656)
Lee M. Pulju (#0321397)
Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

James B. Niehaus (OH 0020128)
Christopher C. Koehler (OH 0059384)
Julie R. Fenstermaker (OH 0080113)
Frantz Ward LLP
2500 Key Center
127 Public Square
Cleveland, OH 44114
(216) 515-1660

*Attorneys for Norman Noble, Inc.*

*s/Courtland C. Merrill*
Joseph W. Anthony (#2832)
Courtland C. Merrill (#311984)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
(612) 349-6969

Gregory L. Diskant
Robert W. Lehrburger
Michael J. Timmons
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Phone: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for CORDIS Corp.*

3193854v.4